## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**HOWARD LAMPTON, JR.**                    **CIVIL ACTION**

**versus**                                          **NO. 05-3014**

**LYNN COOPER**                              **SECTION: "S" (1)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2).[1] Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination. According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Howard Lampton, Jr, is a state prisoner incarcerated at the Avoyelles Correctional Center, Cottonport, Louisiana. On October 16, 2000, he was convicted of manslaughter in violation of La.Rev.Stat.Ann § 14:31.[2] On October 24, 2000, he was sentenced to a term of thirty years imprisonment at hard labor with credit for time served.[3] On November 28, 2001, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[4] He then filed with the Louisiana Supreme Court an application for a writ of certiorari which was denied on January 10, 2003.[5]

On March 20, 2003, petitioner filed with this Court a federal application for *habeas corpus* relief.[6] In support of that application, he claimed: (1) his sentence was excessive; (2) the state failed to prove beyond a reasonable doubt that he was correctly identified as the perpetrator of the crime; and (3) his conviction was obtained by use of a coerced confession. The state conceded that petitioner's federal application was timely but argued that the application should be dismissed because he failed to exhaust his state court remedies as to his third claim. On July 18, 2003, the undersigned found that the state was correct and recommended that the federal petition

---

[2] State Rec., Vol. II of III, transcript of October 16, 2000, p. 76; State Rec., Vol. I of III, minute entry dated October 16, 2000; State Rec., Vol. I of III, jury verdict form.

[3] State Rec., Vol. II of III, transcript of October 24, 2000, p. 3.

[4] State v. Lampton, No. 2001-KA-0834 (La. App. 4th Cir. Nov. 28, 2001) (unpublished); State Rec., Vol. I of III.

[5] State v. Lampton, 834 So.2d 435 (La. 2003) (No. 2002-KO-0502).

[6] Lampton v. Kaylo, Civil Action No. 03-857 "S"(1) (E.D. La.). "A court may take judicial notice of related proceedings and records in cases before the same court." MacMillan Bloedel Ltd. v. Flintkote Co., 760 F.2d 580, 587 (5th Cir. 1985).

be dismissed without prejudice for failure to exhaust state court remedies.  Petitioner did not object

to that recommendation.  On December 22, 2003, the United States District Judge issued an Order

and Reasons dismissing the application without prejudice on the basis recommended; however, the

District Judge included a provision allowing petitioner "to move to reopen the instant action within

ninety (90) days of a final state court determination on his unexhausted claims, thus preserving

March 20, 2003 as the filing date of his federal petition."

   In February, 2004, petitioner filed with the state district court an application for post-

conviction relief.[7]  In that application, petitioner asserted that (1) he was indicted by a grand jury

empaneled in a manner that violated the Louisiana Constitution and (2) he received ineffective

assistance of counsel.  On April 13, 2004, the state district court denied the grand jury claim, finding

that the claim was procedurally defaulted; however, the court did not address the ineffective

assistance of counsel claim.[8]  Petitioner challenged that judgment by filing a writ application with

the Louisiana Fourth Circuit Court of Appeal.[9]  That court denied the application, finding "no error

in the trial court's denial of [petitioner's] claims regarding the grand jury" and independently

reviewing the ineffective assistance of counsel claim and finding that it had no merit.[10]  Petitioner

---

[7] State Rec., Vol. III of III.

[8] State Rec., Vol. III of III, Judgment dated April 13, 2004.

[9] State Rec., Vol. III of III.

[10] State v. Lampton, No. 2004-K-0843 (La. App. 4th Cir. May 27, 2004); State Rec., Vol. III of III.

then filed with the Louisiana Supreme Court an application for a writ of certiorari[11] which was denied on April 29, 2005.[12]

On July 6, 2005, petitioner returned to this Court, submitting the instant application for federal *habeas corpus* relief.[13]  In support of his application, petitioner claims:

1.   Petitioner received ineffective assistance of counsel;

2.   Petitioner was indicted by a grand jury empaneled in a manner that violated the Louisiana Constitution;

3.   Petitioner's sentence was excessive; and

4.   The state failed to prove beyond a reasonable doubt that petitioner was correctly identified as the perpetrator of the crime.

On May 5, 2006, the state filed a response in this matter, contending that petitioner's federal application is untimely.  In light of that contention, the state did not address the merits of petitioner's claims.[14]

---

[11]   State Rec., Vol. III of III.

[12]   State *ex rel*. Lampton v. State, 901 So.2d 1057 (La. 2005) (No. 2004-KH-1689); State Rec., Vol. III of III.

[13]   Rec. Doc. 3.

[14]   Rec. Doc. 11.

Timeliness

In arguing that the instant federal application is untimely, the state fails to take into account the United States District Judge's order in Lampton v. Kaylo, Civil Action No. 03-857 "S"(1) (E.D. La). As noted previously, in that order, the District Judge ruled petitioner would be allowed "to move to reopen the instant action within ninety (90) days of a final state court determination on his unexhausted claims, thus preserving March 20, 2003 as the filing date of his federal petition." However, as a preliminary matter, the undersigned concedes that it is unclear how that order should be interpreted with respect to the instant petition for at least two reasons.

First, petitioner did not move to reopen Civil Action No. 03-857; rather, he simply filed a completely new petition. Nevertheless, considering that petitioner mentioned the above-referenced order in his supporting memorandum,[15] and in light of the "traditional disposition of leniency toward pro se litigants,"[16] the undersigned is reluctant to split that particular hair. This is particularly true, where, as here, the District Judge expressly added the ninety-day period for reopening, a provision not included in the original Report and Recommendation.

The matter is, however, further complicated by the fact that petitioner has arguably exceeded the leeway granted to him by the District Judge. The District Judge apparently intended to allow petitioner to return to state court to exhaust the one unexhausted claim from his original federal petition, i.e. the claim that his conviction was obtained by use of a coerced confession. Rather than pursuing that claim, petitioner's subsequent post-conviction application pursued two

---

[15] Rec. Doc. 3, supporting memorandum, p. 2.

[16] Spotville v. Cain, 149 F.3d 374, 377 (5th Cir. 1998).

- 5 -

entirely different claims, i.e. that he was indicted by a grand jury empaneled in a manner that violated the Louisiana Constitution and that he received ineffective assistance of counsel.  It is those two claims, along with the two exhausted claims from his first federal petition, that he now asserts in the instant federal petition.[17]

In any event, it appears that the undersigned need not determine to what extent, if any, the instant petition falls within the terms of the District Judge's prior order.  Even without the benefit granted in that order, it appears that the instant petition, considered alone, is timely filed for the following reasons.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his conviction or sentence becomes "final."  Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).

Petitioner's one-year limitation period for seeking federal *habeas corpus* relief commenced on April 10, 2003, when his time for filing a petition for a writ of certiorari with the United States Supreme Court expired after the Louisiana Supreme Court denied his writ application on January 10, 2003.  See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999); Chester v. Cain, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); see also U.S. Sup. Ct. R. 13(1).

Moreover, petitioner's statute of limitations was tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking

---

[17] Petitioner does not challenge the use of his confession in the instant petition.

a conviction or sentence was pending in state court.  28 U.S.C. § 2244(d)(2).  Because petitioner is

entitled to no tolling credit for his prior *federal* application,[18] two hundred ninety-seven (297) days

of his one-year statute of limitations elapsed prior to being tolled by the filing of his state post-

conviction application on or about February 2, 2004.[19]  Although that application was denied, tolling

then continued uninterrupted during the period of appellate review, so long as petitioner sought such

review in a timely manner.  See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-

70 (5th Cir. 2004).  Assuming petitioner sought such appellate review in a timely manner,[20] the

statute of limitations again resumed running when the Louisiana Supreme Court denied writs on

April 29, 2005.

At that point, petitioner had sixty-nine (68) days of the statute of limitations

remaining,  i.e. until July 6, 2005.  Petitioner signed his federal *habeas corpus* application on July

6, 2005.[21]  Because the Court will consider the date of signing as the date of filing,[22] and because

---

[18] Duncan v. Walker, 533 U.S. 167, 172 (2001); *In re* Wilson, 442 F.3d 872, 876 n.5 (5th Cir.
2006).

[19]  The state notes in its response that it is unclear from  the state court record when that
application was actually filed.  However, because the application was dated "02 04," the state
assumed for the purpose of this proceeding that the application was filed on February 1, 2004. Rec.
Doc. 11, p. 5.  Because February 1 was a Sunday, this Court modifies that assumption slightly,
instead assuming that the application was filed on February 2, 2004.

[20]  The state does not argue that his related appellate filings were untimely.

[21]  Rec. Doc. 3.

[22]  The  signing  date  represents  the  earliest  date  that  petitioner  could  have  presented  his
application to prison officials for mailing and, therefore, the earliest date that this Court could deem
his *habeas* petition to have been filed for statute of limitations purposes.  Roberts v. Cockrell, 319
F.3d 690, 691 n.2 (5th Cir. 2003).

that date fell within the statute of limitations, it appears that his new petition is timely filed regardless.

Exhaustion

In its response, the state also appears to argue that only the first two claims of petitioner's application, i.e. that he received ineffective assistance of counsel and that he was indicted by a grand jury empaneled in a manner that violated the Louisiana Constitution, are exhausted.[23]   However, the state ignores the that fact that, in Civil Action No. 03-857, the state previously conceded and this Court found that the remaining two claims, i.e. that his sentence was excessive and that the state failed to prove beyond a reasonable doubt that petitioner was correctly identified as the perpetrator of the crime, were exhausted on direct review.   Therefore, the undersigned declines to recommend that the instant petition be dismissed based on a failure to exhaust state court remedies.[24]

Standard of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that

---

[23]   See Rec. Doc. 11, pp. 1-2 (indicating that those claims were exhausted in the state post-conviction proceedings).  Pursuant to 28 U.S.C. § 2254(b)(1)(A), a petitioner must normally first exhaust his remedies by presenting his claims to the state's highest court before seeking *habeas corpus* relief from the federal courts.  Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998).

[24]   Even if there were an exhaustion problem, federal law "allows a federal court, in its discretion, to *deny habeas relief* on the merits, regardless of whether the applicant has exhausted state remedies" and whether exhaustion is waived by the state.  Jones v. Jones, 163 F.3d 285, 299 (5th Cir. 1998) (emphasis in original); 28 U.S.C. § 2254(b)(2).

the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts

of this case as follows:

At trial Sharon Ryals, the victim's mother, testified that the victim, Gregory Parker, was thirty-two years old and had undergone a hip replacement weeks before his death.  He could walk with the aid of a cane, and he could not run.  She identified a photograph of her son.

Dr. Michael DeFatta, a forensic pathologist for the Orleans Parish Coronoer's Office, testified that he supervised the autopsy of Gregory Parker conducted by Dr. Michael Cramer.  He identified the autopsy report, which bore his signature.  Dr. DeFatta stated that the victim suffered:  an inch deep laceration at the back of the scalp on the left side, which caused a hemorrhage; a hemorrhage in the right side of the deep muscles around the first two cerebral vertebrae; and a sheering away of the ligaments between the first and second bones.  The doctor said that such sheering of the ligaments occurred only in automobile accidents when the victim suffered a heavy impact in those areas.  There was also bleeding around the brain and in the layers of the brain due to the impact at the back left part of the head.  There were also six separate areas of hemorrhage in deep muscles in the back.  Dr. DeFatta stated that the laceration as well as the areas of hemorrhage in the back muscles were caused by a blunt trauma ("something making an impact on those areas of the body").  The doctor said that it was very unlikely that there would be five or six areas of hemorrhage with a fall backward.  Normally a fall would cause one solid area of hemorrhage.  What was present was more consistent with multiple blows to the area.  The doctor noted a well-healed scar on the victim's left hip, which indicated some type of surgery.  Dr. DeFatta declared that the cause of death was multiple blunt force traumatic injuries to the head as well as the neck of the victim.  On cross-examination Dr. DeFatta could not recall if the victim had been treated at Charity Hospital, but defense counsel introduced the Medical Center of Louisiana records for the victim.  The doctor said that the victim's back was surgically inspected for injuries during the autopsy.

Officer Anika Glover testified that in the early morning hours on September 19, 1999, she received a call from the area of Bourbon and St. Louis Streets around 3:45 a.m.  When the officer arrived at

the scene about 3:50 a.m., she saw a Lucky Dog vendor lying partially on the ground and partially against the wall. An African-American, Cleveland Moore, was holding the victim's head with ice to his head. The officer saw a stream of blood going down the sidewalk. The victim was not conscious; his eyes were dilated, fixed and open. He was not breathing. Officer Glover identified a number of photographs, including one from the riverside of Bourbon to Patout's Restaurant where the victim was found. The officer called out the crime lab, and pictures were taken. Officer Glover indicated on the photo that the victim's shoulder was lying on the step to the restaurant in the photo, and the rest of his body was on the sidewalk.

On cross-examination Officer Glover said that she spoke to Mr. Moore, and the restaurant manager, Dallas Hager. She developed a suspect named Dave, and she turned all information over to the other officers, who would investigate the crime. Referencing the dispatch history provided by defense counsel, the officer said that the call went out at 3:57 a.m., and she arrived at the scene at 4:03 a.m. On redirect examination the officer noted that the description indicated that the perpetrator was wearing a white T-shirt and blue jean shorts.

Dallas Paul Hagar, the Lucky Dog supervisor, testified that he had made trips out to the victim's cart at 8:00 p.m., 10:00 p.m., midnight, and 2:00 a.m. on the night of the attack to pick up money and provide supplies. On the second time he passed by, Gregory Parker was videotaping the crowd with his camera. Hagar said that he had warned Parker the week before that videotaping people on the street could get him into trouble. Parker's station was at St. Louis and Bourbon Streets beside Patout's Restaurant and across the street from Chris Owen's Club. Parker was just returning to work after his hip surgery. At that time he was using a cane to help him walk, and someone had to push the Lucky Dog cart down to his location for him. At 3:55 a.m. Hagar received a call from another vendor that something had happened on Parker's corner, and he went down to the location. It took him about ten minutes because he ran from 517 Gravier Street, the office location. When he arrived, the ambulance with Parker was pulling out. He saw a huge puddle of blood about fifteen feet from the cart, which was located approximately six to eight inches from the wall. He spoke to the female police officer, who told him that robbery was not the motive because the money was still there. Then Hagar told the police officer that Parker's video camera was missing. Two videos were still in the cart. On cross-examination Hagar stated that normally another Lucky Dog vendor

would have been positioned by Chris Owens' Club; however, he did not work that night.

Detective Anthony Small testified that the victim was alive when he was transported to Charity Hospital, and he died at 1:41 p.m. that afternoon. The detective obtained the aggravated battery incident report, and he canvassed the area for additional evidence and additional witnesses. He located Donald Marshall through Eighth District Officer K.K. Karonja. [FN 1] At first Marshall wanted to remain anonymous because he lived and worked in the area. Although Marshall agreed to meet Detective Small, he did not appear. The police discovered that Marshall worked at Razoo's Bar located in the 500 block of Bourbon. Detectives Small and Archie Coffman, along with Small's supervisor, Sgt. Gerard Dugae, met face to face with Marshall at Razoo's Bar. The officers presented a photographic lineup of six pictures to Marshall in the manager's office on the second floor of Razoo's Bar. When Marshall picked out photo number four, a picture of Lampton, he said: "That's your pipe guy." Marshall signed, dated, and wrote the time on photo number four, and he initialed, dated and indicated the time on the other five pictures. Based on Marshall's selection, Detective Small prepared an application for an arrest warrant as well as a search warrant. The detective executed the search warrant at 118 South Murat, Lampton's last known address, according to the NCIC computer. Lampton surrendered himself at the Fourth District police station. The officers advised him of his rights and transported him to the homicide department where Lampton was again advised of his rights. Lampton waived his rights and signed a waiver of rights form. Detective Dwight Deal conducted the questioning, and Lampton's statement was videotaped and tape-recorded. The taped statement was played for the jury.

> [FN 1] The officer's name has different spellings in the record. In the transcript it is spelled "Carongi," and in the police report, the officer's name is spelled "Karonja."

According to the September 21, 1999 transcribed statement, Lampton was born on September 28, 1979 and lived at 2439 Murl Street, apt. 19. He also used his mother's address, 118 South Murat Street. Lampton stated that he was in Chris Owens' Club at about 3:45 a.m. Sunday morning. He was with a crowd of people, but he was drinking with Brian. Lampton was leaving the club to go home.

When he walked outside, there was a hot dog man on the corner.  The vendor was a white, skinny male in about his forties.  He was about five feet, eight inches tall with long hair.  He was on the side of Chris Owens' Club.  Lampton said that he "had like a li'l argument" with the vendor.  Lampton stated that he and Brian were "gettin' drunk" and "rappin' ... making beats on the wall of Chris Owens ... and this man jus' out of the blue moon ... startin' ar ..., aggravatin' us ... tellin' us about gettin' off the corner, or from around his business area." Lampton identified the man as the hot dog man.  Lampton explained that he and the hot dog man had a face to face argument about leaving the corner.  Lampton said that the hot dog man pushed him and something clicked.  Lampton stated that he "punched him in his, in his ... in his head ... jus' punched him.  And he fell ... I leaned, then leaned over him with another female that was on the corner ..."  He said that the victim just fell straight back head first.

Lampton continued that a female asked what was wrong, and Lampton remarked that he had hit the man, who then fell.  He did not know where Brian was at the time.  He thought that Brian saw him hit the hot dog man.  As he walked away up Bourbon Street to the 300 block, Brian caught up with him, and they stopped in a stripper club for more drinks.  He did not see the hot dog man open his eyes or talk before leaving him in the woman's arms.  Lampton related that he was wearing a white Tommy Hilfiger shirt (a button-down-the-front dress shirt), starched jeans, and white tennis shoes.  He had a T-shirt on underneath.  Lampton stated that he had four gold teeth and was was wearing no hat that night.  He drank a medium 190 octane Daiquiri.  Brian was wearing blue jeans with a beige soldier rag scarf on his head.  Lampton said that he had no stick in his hand; he was holding a drink.  He claimed that he did not see the victim or anyone else with a video camera.  He took no camera or anything else from the scene, the hot dog man, or the cart, but he could not say whether Brian had taken anything.  Lampton stated that he went to jail that same morning about 5:30 a.m. because a stripper at the Temptations Club said he took $99.00 from the counter, and he was charged in municipal court.  Lampton concluded:

> I'm sorry that this man ... has passed away from a blow to the face ... because I did not have no intentions on tryin' to kill this man or hurt this man intentionally.  All I wanted to do is jus' like ... get him off of me, or out of my face.  And he had to really put his hands on me first.  And I'm sorry the man is gone,

> cause I would not take no one's life from them.  I am
> very much sorry ... and I would like to see this man
> alive again, which is not true.  But I am sorry.  I'm
> real sorry for it.

Lampton did not know Brian's address or whether he still went to the same club.  Lampton had worked that night for a temporary service at the Convention Center, A.T.S. Personnel.

Detective Small said that the warrant was executed at 118 South Murat Street, Lampton's last known address.  The officers found the defendant's brother, David Lampton, in the house, but released him when they discovered his identity.  The detective went to the Lucky Dog Office, but the camcorder was not on the cart.  The victim's backpack, a cassette, a battery, and a camera case were on the cart when it was returned.  The camera was never recovered.  Detective Small said that the defendant's photo had been given to the media, and then he turned himself in.

On cross-examination the detective stated that he knew that Howard Lampton had been arrested on the municipal theft charge that morning.  He admitted that he was aware that the victim had a dispute with two other males over what they were paid for pushing the cart to the Bourbon and St. Louis Street location.  The detective stated that David Marshall told the officers that he saw Lampton, who struck Parker, being arrested down at the Temptations Club for theft.

Deborah Wesley, a criminalist, testified that she tested Lampton's T-shirt, shorts, and tennis shoes.  Blood found only on the T-shirt was not enough to determine the type.  On cross-examination she agreed that it could have been Lampton's blood.

Donald Marshall, (a full-time student at the time of the trial) who had been working as a doorman at Razoo's Bar at the time of the crime, testified that he was standing outside the door closest to St. Louis Street.  Razoo's Bar was located in the middle of the block across from Chris Owen's Club.  He knew the Lucky Dog vendor and had spoken to him several times.  Marshall said that the victim videotaped all the problems that occurred across the street at Chris Owen's Club.  He related that around 3:45 a.m. a group of people were over at the Lucky Dog stand.  Marshall stated that one "actually came across, came like over across the edge of the Lucky Dog stand and punched the Lucky Dog vendor that was, he was sitting on a stool and he punched him right in the face and knocked him off the stool."  Marshall had seen the vendor on crutches; people had pushed his cart to his location for him.  Marshall continued that there were

four or five fairly young individuals, who "started beating him [Parker] and kicking him." They "were punching him in the head, in the back, and they were football kicking him to the point where he was literally on all fours just kind of moving closer and closer to my door."

Marshall said that he was watching because it was his job to close Razoo's doors to protect the customers and employees inside. He was making sure that "nothing goes into the club." Marshall estimated that the beating went on for two to three minutes, but maybe up to four or five minutes. The people on the sidewalk moved into the street to get away from what was happening. Marshall had a clear view. When the victim was down on the ground on his stomach with his head to his side a little bit, one man reached behind his back, pulled out a pipe, and hit the victim in the head. Marshall identified Lampton as the man with the pipe. After striking the victim with the pipe, Lampton and the others ran down to St. Louis and up St. Louis toward Rampart Street. The police arrived within minutes. Marshall radioed the head bouncer, who called the manager. Then an ambulance was called. His manager and others crowded around the victim, but Marshall saw Parker just lying there. There was blood everywhere.

Marshall stated that he saw Lampton again around 4:30 or 5:00 the same morning. Lampton had been arrested three or four blocks down Bourbon Street in front of Temptations. After Razoo's Bar closed, the employees went down to the Alibi on Bienville Street. Marshall was on his way back home when he spotted Lampton. Marshall said that the area was well-lit due to street lighting and the lights on the clubs. He stated that he was absolutely sure that the defendant whom he had just identified was the man who struck the victim with the pipe. Marshall stated that he did not notify anybody at first because he was scared; he worked there and knew what went on across the street at the corner and in general. Marshall knew Officer K.K. Karonga from working at Razoo's Bar. Marshall said he trusted the officer, and spoke to him the next day. Officer Karonga put Marshall in touch with someone he trusted, Detective Small. The detective went to see Marshall at work when he did not meet the officer at police headquarters according to prior arrangements. Marshall explained that someone on the street asked him why he was going to the police station that day, and he "got spooked...." According to Marshall, Detective Small brought a set of photographs and asked him if he recognized anybody. Marshall

picked out one photo as the man who hit the victim with the pipe, and he signed the back of that photo.

On cross examination Marshall said that he did not know which man punched the victim in the nose and knocked him off the stool because he "couldn't see exactly who hit him." Marshall said that when the victim was being kicked, he was down on his knees. Marshall stated: "[T]hey were just mauling him [Parker]." Marshall stated that one went behind his back to pull something out; he thought it was a gun and started to close Razoo's doors. Then the man pulled out the pipe and hit the victim in the head. The fight started on the corner and moved toward him. When confronted with prior testimony that the incident began as a pushing match and then turned into a violent altercation where three or four individuals were beating one, Marshall agreed that was correct. He said that the group of men, including Howard Lampton, had attempted to enter Razoo's Bar through his door earlier that night, but they did not go in.[25]

Ineffective Assistance of Counsel

Petitioner contends that his trial counsel was ineffective. In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. <u>See</u> <u>id</u>. at 697. If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. <u>Id</u>.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below

---

[25] <u>State v. Lampton</u>, No. 2001-KA-0834, pp. 1-10 (La. App. 4th Cir. Nov. 28, 2001) (unpublished); State Rec., Vol. I of III.

an objective standard of reasonableness." <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  <u>See Strickland</u>, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  <u>See Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id</u>.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." <u>Crockett</u>, 796 F.2d at 793.

A claim of ineffective assistance of counsel is a mixed question of law and fact. <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002).  Therefore, this Court must defer to the state court on such claims unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Petitioner contends that his trial counsel was ineffective in several respects. The Court will address each of petitioner's contentions.

First, petitioner contends that counsel was ineffective in failing to challenge petitioner's indictment. Petitioner does not elaborate on this claim; however, the Court assumes that he is contending that his counsel should have challenged the indictment on the basis that, as he argues in his second claim herein, the indictment was invalid because it was handed down by a grand jury empaneled pursuant to a Louisiana law later declared unconstitutional by the Louisiana Supreme Court as a prohibited "local law." Although not cited by petitioner, his contention is clearly based on State v. Dilosa, 848 So.2d 546 (La. 2003), in which the Louisiana Supreme Court held, *inter alia*, that the provisions of Louisiana law which established a unique method for the selection of the grand jury venire and foreperson in Orleans Parish violated the Louisiana Constitution's prohibition against the passage of local laws concerning criminal actions.

"[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364 (1993) (quoting Strickland, 466 U.S. at 690). At the time of counsel's failure to file a motion to quash, the Louisiana Supreme Court's opinion in Dilosa had not been issued. Even if petitioner's counsel perhaps could have foreseen the viability of such a claim, a fact that petitioner has not established, it nevertheless does not necessarily follow that it was objectively unreasonable for counsel not to assert such a claim. Where the law regarding a claim is unsettled and counsel could reasonably have believed that a claim would not prevail, counsel is not constitutionally deficient in failing to raise the claim. See Givens v. Cockrell, 265 F.3d 306, 309 (5th Cir. 2001); see also

- 18 -

Sanders v. Cain, Civil Action No. 02-0971, 2002 WL 32191037, at *28 (E.D. La. Dec. 6, 2002) (counsel was not ineffective in failing to file a motion to quash where law regarding the issue was unsettled at the time), adopted, 2003 WL 21920894 (E.D. La. Aug. 8, 2003), certificate of appealability denied, No. 03-30844 (5th Cir. Feb. 3, 2004) (unpublished).  Therefore, it cannot be said that petitioner's counsel performed deficiently in failing to file a motion to quash the indictment.

Moreover, even if the Court were to assume that counsel performed deficiently in that regard and that such a motion to quash would have been granted, petitioner cannot show prejudice as required to support an ineffective assistance of counsel claim.  The state, based on the overwhelming evidence, could simply have procured a new indictment against petitioner from a properly empaneled grand jury.  Because a successful grand jury challenge would have served no purpose other than to delay the trial, petitioner cannot establish that he was prejudiced by the failure to file such a motion.  Pickney v. Cain, 337 F.3d 542, 545 (5th Cir. 2003).

Petitioner next contends that his counsel was ineffective in failing to "prepare a sound defense." However, petitioner identifies no potentially viable defense available that defense counsel eschewed.  Therefore, petitioner has fallen woefully short of meeting his burden to establish that his counsel performed deficiently.  Sometimes, as is evidently the case here, when representing an obviously guilty client, counsel's only choice is to vigorously test the state's case and argue to the jury that the state has failed to carry its burden of proving that the accused is guilty beyond a reasonable doubt.  Simply because counsel was unable to fashion a nonexistent defense out of whole cloth does not mean that he performed deficiently.

- 19 -

Petitioner next contends that counsel "conceded" petitioner's guilt in his closing arguments.  Petitioner, who bears the burden of proof in these proceedings, has presented no corroboration whatsoever that such a concession of guilt occurred,[26] and, given counsel's vigorous representation at trial, the Court finds that such a concession is unlikely to have occurred.  However, to the extent that petitioner means that counsel conceded that petitioner was involved in the incident, such a concession, if it occurred, would not constitute ineffective assistance of counsel.  Counsel could not viably deny petitioner's involvement, given that petitioner confessed his involvement to the police and that confession was admitted into evidence at trial.  Under those facts, conceding the obvious is hardly deficient performance; rather, it is certainly preferable to alienating the jury by implausibly denying facts clearly established by overwhelming evidence.

Lastly, petitioner seems to hint that he was denied the opportunity to testify by counsel.  A decision whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight."  United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); see also United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002), cert. denied, 541 U.S. 1031 (2004).  Petitioner offers no suggestion in his petition as to how he would have testified so as to rebut the overwhelming, damning evidence against him.  If petitioner would simply have testified consistently with this confession, which was already in evidence, he would have gained little by testifying but, at the same time, risked much by exposing himself to cross-examination.  On the other hand, if he were going to testify contrary to his confession, he has offered

_____

[26]  The transcript does not contain a transcription of the closing argument.  See State Rec., Vol. II of III, transcript of October 16, 2000, p. 69.

nothing to demonstrate why his testimony would have not be perceived as anything more than an implausible, self-serving attempt to mislead the jury.  In either event, his testimony would seemingly have aided the prosecution with no apparent benefit to the defense.  Accordingly, petitioner has failed to meet his burden to demonstrate that counsel performed deficiently in failing to have him testify or that he was in any way prejudiced.[27]

---

[27] To the extent that petitioner is perhaps claiming that he wanted to testify but his counsel refused to let him, that claim also fails.  "[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  Rock v. Arkansas, 483 U.S. 44, 49 (1987).  However, petitioner has offered no proof whatsoever that counsel in fact prevented him from testifying.

This Court has reviewed the trial transcript and there is no mention of petitioner's purported desire to testify at trial.  Of course, the mere fact that petitioner failed to stand up in open court and insist on testifying should not be dispositive of the issue.  See United States v. Mullins, 315 F.3d 449, 455 (5th Cir. 2002); see also United States v. Araujo, 77 Fed. App'x 276 (5th Cir. 2003), cert. denied, 543 U.S. 849 (2004).  Nevertheless, the Court cannot ignore the fact that petitioner has never presented anything whatsoever either to the state courts or to this Court to corroborate an allegation that his counsel refused to allow him to testify.  Without more, petitioner's bare allegations are insufficient to trigger either further fact-finding by this Court or the granting of relief.  As the United States Seventh Circuit Court of Appeals noted in a case in which a petitioner alleged that he had been denied the right to testify by his counsel:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable.  It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen.  Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify.  Therefore I'm entitled to a new trial." ...
> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him.  It just is too facile a tactic to be allowed to succeed.  Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant

Petitioner has failed to demonstrate that the state court's decision on any of his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Applying the AEDPA's deferential standard, this Court therefore rejects those claims.

<u>Grand Jury Claim</u>

Petitioner claims that he was indicted by a grand jury empaneled in a manner that violated the Louisiana Constitution. Specifically, he argues that the grand jury procedures set forth in Louisiana law and made applicable only to Orleans Parish were "local laws" prohibited by the Louisiana Constitution.

Again, as noted previously in this opinion, petitioner is asserting a claim based on <u>State v. Dilosa</u>, 848 So.2d 546 (La. 2003). In <u>Dilosa</u>, the Louisiana Supreme Court held that Louisiana laws which established a unique method for the selection of the grand jury venire and foreperson in Orleans Parish violated La.Const. art. III, § 12(A), which prohibits the passage of local laws concerning criminal actions. Petitioner essentially argues that <u>Dilosa</u> should be given retroactive effect and his indictment declared legally invalid. Petitioner's <u>Dilosa</u> claim does not merit relief for two reasons.

---

a further investment of judicial resources in determining the truth of the claim.

<u>Underwood v. Clark</u>, 939 F.2d 473, 475-76 (7th Cir. 1991).

First, petitioner's <u>Dilosa</u> claim is procedurally barred in this federal proceeding.[28]

Regarding procedural bars, the United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision.  To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims.  This rule applies to state court judgments on both substantive and procedural grounds.  Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground.

<u>Finley v. Johnson</u>, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

In the last reasoned state court judgment addressing petitioner's grand jury claim, the state district court denied the claim based on Louisiana's rule that a challenge to an indictment is waived if not raised in a pretrial motion to quash.[29]  It is clear that Louisiana's rule that grand jury challenges are waived unless presented in a pretrial motion to quash is an independent and adequate

---

[28]   Because the state failed to respond to petitioner's underlying claims at all, it has not, of course, raised the issue of the procedural default.  Nevertheless, a federal *habeas* court has the discretion to raise a procedural default *sua sponte*.  <u>See</u> <u>Magouirk v. Phillips</u>, 144 F.3d 348, 357-58 (5th Cir. 1998).  Accordingly, *petitioner is hereby specifically instructed that this Report and Recommendation is notice to him that this Court is sua sponte raising the procedural bar and that petitioner must submit any evidence or argument concerning that issue as part of any objections he may file to this report.*  <u>Id</u>. at 348.  Nevertheless, as the Court also notes later in this opinion, petitioner could not be granted relief on his <u>Dilosa</u> claim even if it were not procedurally barred.

[29]   State Rec., Vol. III of III, Judgment dated April 13, 2004.

state ground so as to support the application of a procedural bar.  See, e.g., Williams v. Cain, 125 F.3d 269, 274-76 (5th Cir. 1997).

"When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice."  Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999).  In the instant case, petitioner can demonstrate neither.

Petitioner cannot meet the "cause and prejudice" test in light of the United States Fifth Circuit Court of Appeals' decision in Pickney v. Cain, 337 F.3d 542 (5th Cir. 2003).  In that case, petitioner's claim regarding discrimination in the selection of the grand jury foreperson was procedurally defaulted in state court because no motion to quash had been filed.  The Fifth Circuit found that petitioner could not overcome the resulting federal procedural bar based on the "cause and prejudice" requirement, holding:

> We need not address whether [petitioner] has made a showing of "cause" because we are confident that he has not been prejudiced. United States v. Shaid, 937 F.2d 228, 234 (5th Cir. 1991).  After reviewing the trial record, we have no doubt that, if [petitioner] had been successful in having his indictment quashed, the State of Louisiana would have sought and obtained a second indictment. ... Given the strength of the State's case, a successful grand jury challenge would have served no purpose other than to delay the trial. Accordingly, [petitioner] has failed to prove actual prejudice.

Id. at 545.  Similarly, this Court has reviewed the overwhelming evidence against this petitioner and reached the same conclusion.  Accordingly, petitioner cannot overcome the procedural bar in this case based on the "cause and prejudice" test.

Therefore, petitioner's claim is procedurally barred unless the application of the bar will result in a fundamental miscarriage of justice.  In order to establish a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him.  Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted."  Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted). The United States Fifth Circuit Court of Appeals has held:

> To demonstrate actual innocence, it is necessary that the petitioner show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt ... in light of all of the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongfully excluded or to have become available only after trial.

Lucas v. Johnson, 132 F.3d 1069, 1077 (5th Cir. 1998) (quotation marks and citations omitted). Applying that standard, and considering the overwhelming evidence of petitioner's guilt in this case, the Court finds that petitioner cannot make a persuasive showing that he is actually innocent of the charges against him.  Therefore, he cannot demonstrate that any miscarriage of justice will result from application of the procedural bar.  Accordingly, petitioner's grand jury claim is procedurally barred in this federal proceeding.

Second, even if the claim were not procedurally barred, petitioner could not be granted relief in this proceeding based on that claim.  Dilosa was based on the Louisiana Supreme Court's finding that certain articles of the Louisiana Code of Criminal Procedure violated the *state* constitution's prohibition on the passage of local laws concerning criminal actions.  Nevertheless, the fact that those provisions violated the *state* constitution is of no moment in a federal proceeding.

Federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. § 2254; Engle v. Issac, 456 U.S. 107, 119 (1983).[30]

---

[30]  Moreover, the Court notes that petitioner's claim has no merit even under state law based on State v. Harris, 892 So.2d 1238 (La.) (unpublished appendix available on Westlaw), cert. denied, 126 S.Ct. 102 (2005), in which the Louisiana Supreme Court held:

> The defendant urges that his indictment should have been quashed as it was issued by an unconstitutionally selected grand jury, grand jury foreperson, and grand jury venire, relying on State v. Dilosa, 02-2222 (La. 6/27/03), 848 So.2d 546.  In Dilosa, this Court struck down as unconstitutional La.C.Cr.P. art. 412 and La. R.S. 15:114 in their entirety, the introductory phrases of La.C.Cr.P. arts. 413(B) and 414(B) and La.C.Cr.P. arts. 413(C) and 414(C) in their entirety.  The offending provisions together provided procedures, applicable only in Orleans Parish, for the selection of the grand jury venire, the impaneling of the grand jury, selection of the grand jury foreman, the time for impaneling grand juries and the period of service, and the rotation of the judges who select and control the grand jury.  This Court found the provisions were "local laws" concerning "criminal actions" which regulated the "practice" of Orleans Parish criminal courts in violation of La. Const. art. III, § 12(A)(3).
>
> In this case, the grand jury that indicted the defendant in October of 1993 and the foreman of that grand jury, were selected while the applicable procedures declared unconstitutional in Dilosa were all in effect.  However, the record reflects, and appellate counsel in brief concedes, that no motion to quash the indictment was ever filed in this case.   A criminal defendant must assert a due process or equal protection claim regarding the selection and composition of a grand jury in a motion to quash filed prior to trial or waive any complaint in that regard.  Deloch v. Whitley, 96-1901 p. 2 (La.11/22/96), 684 So.2d 349, 350.  The defendant, thus, has waived review of this issue by his failure to file a pretrial motion to quash the indictment.
>
> Even if the claim was not procedurally defaulted, the defendant is not entitled to relief.  The statute and codal provisions in Dilosa were declared unconstitutional solely because they were local laws in violation of the state constitution, La. Const. art. III, § 12(A).  "The constitutional prohibition against local laws which underlies the Dilosa decision simply reflects a policy decision that legislative resources and attention should be concentrated upon matters of general interest and that purely local matters should be left to local governing authorities."  State v. Williams, 2003-0091 p. 3 (La. App. 4 Cir. 1/14/04), 866 So.2d 296, 298, writ denied, 2004- 0438 (La. 6/25/04), 876 So.2d 831, citing Morial v. Smith & Wesson Corp., 2000-1132

<u>Excessive Sentence</u>

Petitioner next claims that his thirty-year sentence is excessive.  On direct appeal, the

Louisiana Fourth Circuit Court of Appeal rejected that claim, holding:

> Lampton argues that his thirty year sentence is excessive.  He notes the fact that he was not twenty years old at the time of the incident and the fact that he had no felony convictions.  Lampton points out that he was not solely responsible for the victim's injuries and argues that there is some doubt as to whether he inflicted the fatal blow.  Lampton claims that the trial court noted the severity of the victim's injuries, but did not consider the mitigating factors; there was also no presentence investigation.  The State correctly notes that under La.C.Cr.P. art. 875 and La. R.S. 15:1132, the trial court was not required to order a PSI.  The State points out that Lampton was charged with second degree murder, not manslaughter.
>
> In <u>State v. Points</u>, 2000-1371, pp. 8-10 (La. App. 4 Cir. 4/11/01), 787 So.2d 396, 402, this Court stated:
>
> > A sentence may be reviewed for constitutional excessiveness even though it is within statutory guidelines.  <u>State v. Cann</u>, 471 So.2d 701, 703 (La. 1985).  In reviewing a sentence for excessiveness, the Court must first determine whether the trial court

---

p. 22 (La.4/3/01), 785 So.2d 1, 17, <u>cert. denied</u>, 534 U.S. 951, 122 S.Ct. 346, 151 L.Ed.2d 262 (2001); <u>Kimball v. Allstate Ins. Co.</u>, 97- 2885 p. 4 (La. 4/14/98), 712 So.2d 46, 50.  Thus, "the substantial rights of a criminal defendant are not affected *per se* solely because he is indicted by a grand jury selected pursuant to local laws passed by the Louisiana State legislature."  <u>Id</u>.  Where a criminal defendant fails to show that his substantial rights were affected, he is not entitled to relief.  <u>Id</u>.; <u>State v. Rhea</u>, 2004-0091 p. 7 (La. App. 4 Cir. 5/19/04), 876 So.2d 131, 135, <u>writ denied</u>, 2004-0901 (La. 10/1/04), 883 So.2d 1005; <u>State v. Newman</u>, 2003-1721 p. 16 (La. App. 4 Cir. 7/7/04), 879 So.2d 870, 880; <u>see also</u> <u>State v. Mercadel</u>, 2003-3015 p. 8 (La.5/25/04), 874 So.2d 829, 834 (a person can challenge the constitutionality of a statute only if the statute seriously affects his or her rights).  The defendant has made no showing that his substantial rights were effected; thus, this assignment of error lacks merit.

<u>Harris</u>, 892 So.2d 1238, unpublished appendix at **3-4 (footnotes omitted) (available on Westlaw).

complied with La. C.Cr.P. art. 894.1 in imposing the sentence and then determine whether the sentence is too severe given the circumstances of the case and the defendant's background.  State v. Lobato, 603 So.2d 739, 751 (La. 1992).  If the sentence needlessly imposes pain and suffering and is grossly out of proportion to the seriousness of the offense so as to shock our sense of justice, then it may be determined to be unconstitutionally excessive as violative of La. Const. art. 1, § 20 (1974).  Id.  However, a sentence imposed will not be set aside absent a showing of abuse of the trial court's wide discretion to sentence within statutory limits.  Id.

Once adequate compliance with La. C.Cr.P. art. 894.1 is found, the court may consider whether the sentence is excessive in light of sentences imposes by other courts in similar circumstances.

* * *

The trial court has great discretion in sentencing within statutory limits.  State v. Trahan, 425 So.2d 1222 (La. 1983).  A sentence should not be set aside as excessive in the absence of a manifest abuse of discretion.  State v. Washington, 414 So.2d 313 (La. 1982).

At the October 24, 2000 sentencing hearing in the present case, defense counsel expressed Lampton's sorrow and regret for what happened and noted that the prosecutor had relayed that information to the victim's family.  The trial court stated:

Okay.  All right, for the record in this matter, the Court has reviewed the provisions of Article 894.1.  The Court believes this is an extremely serious offense.  There's no more serious an offense, in this Court's opinion, than killing another human being who [sic] you really had no relationship with.

The victim in this matter was doing his job that night.  He was a Lucky Dog salesman in the French Quarter.  According to the State's witness, he was severely beaten for a long period of time, stomped and then finally hit in the head with a piece of pipe, which according to the coroner, crushed his

> skull and caused his death.  The Court believes that's about as bad as you can get in killing another human being.   So the offense, in this Court's mind, is extremely serious.
>
> The Court has also has to look at the background of the defendant.   It's the Court's understanding that he does not have any prior felony convictions.  So, because of his lack of any serious prior record, the Court is not going to give him the maximum sentence that the Court could give in this case which is forty years, but because of the severity of the crime in the way that it was inflicted, the Court believes it demands a substantial sentence.  And it is going to be the sentence of this Court that he serve Thirty (30) Years at hard labor with the Department of Corrections.  On that sentence, by law, he will be given credit for whatever time he has served in jail since his original arrest on the charge.

Lampton objected to the sentence and filed a motion to reconsider sentence, which the trial court denied.

The sentencing transcript shows that the trial court considered the guidelines set out in La.C.Cr.P. art. 894.1 before imposing the thirty year sentence.  Although Lampton avers that the trial court did not consider the mitigating factors, the trial court noted that Lampton had no prior felony convictions, and Lampton's age was apparent. The trial court noted that Lampton would have received the maximum sentence but for the lack of a felony criminal record.  Once there has been adequate compliance with La. C.Cr.P. art. 894.1, the reviewing court may consider whether the sentence is excessive in light of sentences imposed by other courts in similar circumstances. State v. Gibson, 99-0946 (La. App. 4 Cir. 5/3/00), 761 So.2d 670, 679.

In State v. Points, *supra*, p. 10, 787 So.2d at 403, this Court reviewed the imposition of the maximum forty year sentence for a youthful first offender convicted of manslaughter:

> While it is true that the defendant is a somewhat youthful first offender, maximum or near maximum sentences for manslaughter convictions have been affirmed in several cases even where the defendant had no prior convictions.  In State v. Bowman, 95-

0667 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094, this Court affirmed a thirty-three year manslaughter sentence for a sixteen-year-old first offender who drove the car but did not pull the trigger in a drive-by shooting.  In <u>State v. Black</u>, 28,100 (La.App. 2 Cir. 2/28/96), 669 So.2d 667, the Second Circuit affirmed a forty year sentence for a twenty year old defendant who pleaded guilty to a reduced charge of manslaughter.    Moreover, maximum or near maximum sentences for manslaughter convictions have been affirmed in several cases where the defendant had no prior convictions.  Cf.  <u>State v. Maxie</u>, 594 So.2d 1072 (La.App. 3 Cir. 1992); <u>State v. King</u>, 563 So.2d 449 (La.App. 1 Cir. 1990). [Footnote omitted.]

Lampton was indicted for second degree murder, and he was convicted of manslaughter with a sentencing range of zero to forty years.  The trial court did not impose the maximum sentence because Lampton had no prior felony record.  The trial court noted the seriousness of the crime of beating a person to death.  The trial court based the sentence on the severity of the crime and the way that the victim was brutally beaten, struck on the head, and killed.  There is no abuse of the trial court's sentencing discretion.[31]

The state court analyzed petitioner's claim under state law.  This Court does not sit to review errors of state law; rather, federal *habeas corpus* relief is available only for violations of federal constitutional law.  <u>Narvaiz v. Johnson</u>, 134 F.3d 688, 695 (5th Cir. 1998).  Therefore, this Court looks only to see whether petitioner's sentence is so excessive as to violate the Eighth Amendment of the United States Constitution.

In <u>Solem v. Helm</u>, 463 U.S. 277, 284 (1983), the Supreme Court held that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate

---

[31] <u>State v. Lampton</u>, No. 2001-KA-0834, pp. 15-19; State Rec., Vol. I of III.

to the crime committed."  "This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts."  United States v. Gonzales, 121 F.3d 928, 942 (5th Cir. 1997) (citing Rummel v. Estelle, 445 U.S. 263, 274-76 (1980)).  "[C]ourts must grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes."  Gonzales, 121 F.3d at 942 (quotation marks omitted). "[T]herefore, it is firmly established that successful challenges to the proportionality of punishments should be exceedingly rare."  Id.  (quotation marks omitted).

Interpreting Solem in light of intervening precedent, the United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence.  Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions.

McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992).

The Fifth Circuit has noted that Rummel v. Estelle, 445 U.S. 263 (1980), "establishes a benchmark for disproportionate punishment under the Eighth Amendment."  Gonzales, 121 F.3d at 943.  In Rummel, the Supreme Court upheld a petitioner's sentence to life imprisonment for obtaining $120.75 under false pretenses.  The sentence was imposed under a Texas recidivist statute and took into account petitioner's prior convictions for fraudulent use of a credit card and passing a forged check.  The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences and grossly disproportionate punishments is an inherently subjective judgment, defying bright lines and neutral principles of law. Nevertheless, we can say with certainty that the life sentence approved in <u>Rummel</u> falls on the constitutional side of the line, thereby providing a litmus test for claims of disproportionate punishment in violation of the Eighth Amendment.

<u>Gonzales</u>, 121 F.3d at 943 (footnote omitted).

Applying this "litmus test" and considering the <u>Rummel</u> finding that a *life* sentence was not excessive when imposed for a *nonviolent* offense where the habitual offender had two prior *nonviolent* offenses, this Court has no hesitation in concluding that petitioner's thirty-year sentence for the grave offense of beating a person to death was not grossly disproportionate.  In that the sentence is not grossly disproportionate, this Court's "inquiry is finished."  <u>Gonzales</u>, 121 F.3d at 942.  Because petitioner's sentence is not so excessive as to violate the United States Constitution, this claim must fail.

<u>Identification</u>

Petitioner's final claim is that the state failed to prove beyond a reasonable doubt that he was correctly identified as the perpetrator of the crime.  The United States Fifth Circuit Court of Appeals has noted that claims of insufficient evidence are to be analyzed pursuant to the standard set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979):

> In considering challenges to the sufficiency of evidence in habeas proceedings, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

- 32 -

Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Jackson, 443 U.S. at 319).  A

sufficiency of the evidence argument presents a mixed question of law and fact.  Taylor v. Day, Civil

Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir.

2000).  Therefore, this Court must defer to the state court unless its decision regarding the claim

"was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

 On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected petitioner's

claim, holding:

>  Lampton contends that the state failed to prove beyond a reasonable doubt Lampton's identity as the perpetrator of the alleged manslaughter of Gregory Parker.  He claims that the testimony of the State's only identification witness, Donald Marshall, is not sufficient under the criteria set out in Manson v. Braithwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).  Lampton asserts that Marshall was working one-half block away; he did not see the beginning of the altercation when the victim was knocked from his stool; he did not talk to the police or provide a description at the scene; and he mistakenly connected Lampton to the attack of the hot dog man when he saw Lampton being arrested later that morning in front of Temptations.
>  In State v. Tapp, 99-2279, p. 16 (La. App. 4 Cir. 5/30/01), 788 So.2d 1215, 1225-26, this Court discussed sufficiency of the evidence as to the identity of the perpetrator:
>
> >  In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);

State v. Green, 588 So.2d 757 (La.App. 4 Cir. 1991).  However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime.  State v. Mussall, 523 So.2d 1305 (La. 1988).  The reviewing court must consider the record as a whole since that is what a rational trier or [sic] fact would do.  If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted.  The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.  Mussall; Green; supra.  "[A] reviewing court is not called upon to decide whether it believes the witness or whether the conviction is contrary to the weight of the evidence."  State v. Smith, 600 So.2d 1319 (La. 1992) at 1324.

In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La. 1982).  The elements must be proven such that every reasonable hypothesis of innocence is excluded.  La. R.S. 15:438.  This is not a separate test from Jackson v. Virginia, *supra*, but rather an evidentiary guideline to facilitate appellate review of whether

> a rational juror could have found a
> defendant guilty beyond a reasonable
> doubt.  State v. Wright, 445 So.2d
> 1198 (La. 1984).  All evidence, direct
> and circumstantial, must meet the
> Jackson reasonable doubt standard.
> State v. Jacobs, 504 So.2d 817 (La.
> 1987).

State v. Boudreaux, 2000-0073, p. 5 (La.App. 4 Cir.
12/20/00), 777 So.2d 596, 598-99, (*quoting* State v.
Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99),
744 So.2d 99, 106-107).

When identity is disputed, the State must negate any
reasonable probability of misidentification in order to satisfy its
burden to establish every element of the crime charged beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. at 307, 99 S.Ct. at
2781, 61 L.Ed.2d 560 (1979); State v. Smith, 430 So.2d 31, 45 (La.
1983).  In meeting its obligation to negate any reasonable probability
of misidentification, the State is entitled to present the entire process
by which the defendant was identified and linked to the homicide.
State v. Edwards, 97-1797 (La. 7/2/99), 750 So.2d 893, *cert. denied*,
528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999).  In reviewing
the record to determine sufficiency of the evidence, a jury's
credibility decisions should not be disturbed unless clearly contrary
to the evidence.  State v. Brown, 97-2260 (La. App. 4 Cir. 10/6/99),
746 So.2d 643, 647; State v. Harris, 624 So.2d 443, 447 (La. App. 4
Cir. 1993), *writ denied*, 93-2609 (La. 6/24/94), 640 So.2d 1339.

Lampton claims that his identity as the perpetrator is a key
issue and the State did not prove the identity element.  Lampton gave
a statement and admitted that he was there and punched the victim in
the face.  However, he denied hitting Parker with a pipe, and he
stated that the victim fell.  Lampton maiantains [sic] that the
testimony of Donald Marshall, the only identification witness, should
be evaluated under the criteria set forth in Manson v. Braithwaite,
*supra*.  Lampton argues that Marshall's photographic and in-court
identification were tainted because he saw Lampton a few hours later
being arrested a few blocks away.  The State counters that under the
Manson factors Marshall's identification is constitutionally reliable,
and there was sufficient evidence to convict Lampton of
manslaughter.

To suppress an identification, Lampton must first prove that the identification was suggestive. State v. Prudholm, 446 So.2d 729, 738 (La. 1984). An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the defendant. State v. Robinson, 386 So.2d 1374, 1377 (La. 1980). In State v. Simmons, 99-1154, pp. 8-9 (La. App. 4 Cir. 12/8/00), 779 So.2d 856, 862, quoting State v. Thibodeaux, 98-1673, pp. 20-21 (La. 9/8/99), 750 So.2d 916, 932, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000), this Court stated:

> The Supreme Court held in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), that despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a "very substantial likelihood of irreparable misidentification." Under Manson, the factors which courts examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include: 1) the witness' opportunity to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Id.

In State v. Bright, 98-0398 (La. 4/11/00), 776 So.2d 1134, the defendant Bright challenged the in-court identification made by a witness on a number of grounds, including an argument that the identification was unreliable and questionable. The Supreme Court found that the photo lineup did not unduly focus upon Bright and the other individuals had sufficient similarities to Bright. As to the in-court identification of Bright as the shooter, the Court considered the totality of the circumstances to decide whether there was a substantial likelihood of irreparable misidentification under the Manson factors. The Court noted that the witness' three opportunities to view Bright that night provided an independent basis for his in-court identification. The witness consistently testified that there was light enough for him to see Bright even though there was testimony that it was dark outside the bar. The witness' attention was focused on Bright. Although there were some problems with the witness' initial

description, there was no indication that he hesitated or was uncertain in identifying Bright.  The fact that the photographic lineup was presented to the witness eighteen days after the incident was not significant, especially in light of the fact that there was no undue suggestiveness in the lineup itself.  Id.

In the present case, Donald Marshall was Razoo's doorman and security person, who was standing at the door of the bar.  His job was to watch the street for any trouble so that he could close the door if it became necessary to protect the bar and its patrons.  He testified that the street and the sidewalk were well-lit because the bars and clubs had lit signs, and there were street lights.  Razoo's Bar was located toward the middle of the block not far from the corner where the attack occurred.  Marshall said that he could clearly see the victim as he was being beaten at the corner, and people were clearing the sidewalk.  The victim was moving toward Razoo's door.  Marshall was watching closely when one of the perpetrators, who was later identified as Lampton, pulled something from behind his back.  Marshall said that he thought that it was a gun and prepared to close the door to the bar.  Therefore, his attention was focused on the perpetrators and the victim.  Marshall testified that he then recognized Lampton a couple of hours later when Marshall saw Lampton being arrested in front of Temptations.  Marshall explained that he had not told the investigating police officer what he observed (or provided a description) because he did not want to become involved.  Even after he contacted an officer he trusted the next day, Marshall was afraid and did not meet the officer, who was compelled to seek Marshall out at work.  Marshall identified Lampton in a photo lineup on Monday, September 20, 1999, the day after the attack.  He did not hesitate when he identified the man who had struck the victim in the head with the pipe.  Marshall expressed no doubt when he identified Lampton in court as the perpetrator who hit the victim with a pipe.

Marshall clearly identified Lampton in a photo lineup and at trial as the one perpetrator (of the three or four beating the victim), who pulled a pipe from behind his back and hit the victim on the back of the head.  The defense argument that Marshall's identification was tainted by the fact that he saw Lampton being arrested a couple of hours later and mistakenly connected Lampton to the attack (with a pipe) on Parker has no merit.  The evidence, including Marshall's identification of Lampton, viewed in the light most favorable to the State, was sufficient to convict Lampton of manslaughter.[FN 2]

[FN 2] Manslaughter is defined in La. R.S. 14:31, which provides in pertinent part:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

(2) A homicide committed, without any intent to cause death or great bodily harm.

(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or

(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be

murder under Article
30 or 30.1.[32]

Petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Applying the AEDPA's deferential standard, this Court therefore rejects petitioner's claim.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the federal petition for *habeas corpus* relief filed by Howard Lampton, Jr., be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-third day of May, 2006.



**SALLY SHUSHAN
UNITED STATES MAGISTRATE JUDGE**

---

[32]  State v. Lampton, No. 2001-KA-0834, pp. 10-15; State Rec., Vol. I of III.